Joseph H. BIELUCH, Jr.,
Plaintiff–Appellant,

v.

Bernard SULLIVAN, Commissioner of
Public Safety, I/O, Defendant–
Appellee.

No. 1368, Docket 92–9314.

United States Court of Appeals,
Second Circuit.

Argued April 22, 1993.

Decided July 27, 1993.

Jon L. Schoenhorn, Hartford, CT, for plaintiff-appellant.

Margaret Quilter Chapple, Asst. Atty. Gen. for the State of Conn. (Richard Blumenthal, Atty. Gen.; Michael J. Lanoue, Asst. Atty. Gen.), for defendant-appellee.

Before: PRATT and JACOBS, Circuit Judges, and Whitman KNAPP, Senior District Judge for the United States District Court for the Southern District of New York, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Plaintiff Joseph H. Bieluch, Jr., appeals from a summary judgment granted by the United States District Court for the District of Connecticut, Alan H. Nevas, *Judge*, holding that qualified immunity protected defendant Bernard Sullivan from liability under 42 U.S.C. § 1983 for summarily transferring Bieluch from his position as resident trooper. For the reasons set forth below, we reverse.

## FACTS AND BACKGROUND

Bieluch joined the Connecticut police force in 1967. In 1973, he became one of two "resident troopers" for the Town of New Hartford, Connecticut. Connecticut's resident trooper program is designed to provide community-based policing for towns lacking an organized police force. A resident trooper is functionally equivalent to a chief of police and is a highly desired, prestigious position. As a resident trooper, Bieluch had flexible hours and diverse duties, received an additional stipend of $100 per month, and was under less supervision than regular "road troopers". His duties included performing educational activities in the town; supervising the town constables; and assisting the town's First Selectman in preparing a local public-safety budget, reviewing public-safety ordinances, and monitoring housing-code violations. Bieluch was a New Hartford resident trooper for seventeen years; his summary transfer in 1990 precipitated this lawsuit.

In 1980 Bieluch and his family moved to New Hartford, because he wanted to live in the same town where he worked. As a private citizen, he became active in community affairs. He was elected to New Hartford's Board of Finance, but after the State Ethics Commission issued an advisory opinion stating that his position on the board created a conflict of interest under state laws, he resigned from the board in March 1990. That same month he was elected president of the New Hartford Business and Property Owners' Association, an organization dedicated to overturning a referendum that had approved the construction of a new school. Bieluch was publicly identified on some of the association's written communications as the president and was quoted in local newspapers as a member of the association.

The association circulated petitions calling for the town's Board of Selectmen to rescind their votes authorizing construction of a new school. The board refused to act on the petition, which prompted the association to file a lawsuit against the town and its selectmen. Bieluch was a named plaintiff in the suit, and First Selectman Reginald J. Smith, Jr., was a named defendant. The suit was settled after the town agreed to schedule a referendum to reconsider the issue. The second referendum rescinded the previous approval for the construction of a new school. Its mission accomplished, the association dissolved.

A new organization, the New Hartford Property Owners' Association, formed in May 1990 and elected Bieluch as its president. The organization effectively campaigned against several town budgets proposed by New Hartford's Board of Finance by supporting petitions to force referenda on proposed budgets. At times, the association distributed flyers or mailings to New Hartford residents. Bieluch also personally appeared at town budget meetings and expressed his views. When the fiscal year began on July 1, 1990, the town did not have a budget in place.

Bernard Sullivan was appointed to the position of Connecticut's Commissioner of Public Safety in November 1989. The Commissioner of Public Safety supervises the resident troopers. Conn.Gen.Stat. § 29-5. On or about July 2, 1990, Sullivan received a letter signed by nine New Hartford residents that expressed concern over Bieluch's political activities. Reginald Smith was one of the signatories, but he had signed the letter as a private citizen, without indicating his position as First Selectman.

The letter to Commissioner Sullivan criticized the tactics employed by both of the organizations of which Bieluch had been president. It said that Bieluch had "placed himself at the center of an extremely divisive, ongoing, political controversy", which was "totally inappropriate for a resident state trooper". As examples of his "unethical public conduct and conflict of interest", the letter contained the following allegations:

—Prior to the May 15 referendum to rescind, Trooper Bieluch promised a "secret plan" for a cheaper solution to school space needs. This was widely reported in the press. Yet Trooper Bieluch betrayed the public trust placed in him as a Building Committe [sic] member by publicly refusing to reveal or discuss this plan with fellow committe [sic] members.

—On May 10, 1990 a neutral forum chaired by a professional moderator was held for pro- and anti-school groups to air their views. Trooper Bieluch's P.A.C. was formally invited to participate as panel members. The enclosed letter expressed his refusal.

—During several school referenda Trooper Bieluch's patrol car has been conspicuously parked at polls, providing well-recognized anti-school publicity.

—Trooper Bieluch personally circulated the petition to repeat the school referendum. (How many citizens feel safe or comfortable refusing their Resident Trooper in this role?)

—After the school defeat, Trooper Bieluch's P.A.C. began their assault on our town budget using similar tactics of exaggeration and distortion.

—After one budget defeat May 30, 1990, Trooper Bieluch's P.A.C. has now forced a 2nd budget referendum scheduled June 26, 1990. These actions have recklessly squandered public funds, denied citizens their right of line item veto at a Town Meeting and seriously threaten our town's ability to function as of a new fiscal year July 1, 1990.

—Trooper Bieluch's P.A.C. has publicly targeted our education budget, seeking staff cuts, even though the Education budget has a net increase of only 6% over last year with an increase in enrollment of 5.8%.

—Trooper Bieluch has conducted the business of the N.H. Property and Business Owners' Association from his office in Town Hall and on company time.

Several documents were attached to the letter, including copies of petitions for the school construction referendum, newspaper articles, and various materials distributed by the association.

Sullivan asked his subordinates to check into the matter, but they did not verify the truthfulness of any of the eight allegations of unethical conduct. They did confirm that the Reginald Smith who had signed the letter was the First Selectman, and they recommended transferring Bieluch from his New Hartford resident trooper position. The First Selectman acts as the administrative chief of police. He is not superior to the resident trooper, but has a working relationship with him.

Less than two weeks after Sullivan received the letter, he decided to transfer Bieluch. When Bieluch's immediate commanding officer, Lieutenant Watrous, contacted Smith and told him that Bieluch might be transferred, Smith said that he would like to see Bieluch replaced because he felt that Bieluch's political activities were affecting his work. At a meeting on July 13, 1990, Bieluch was informed that effective August 1, 1990, he was being transferred to Litchfield, Connecticut, a town fifteen miles away from New Hartford. Lieutenant James D. Hiltz, the commanding officer for Bieluch's district, told Bieluch that the transfer was not a disciplinary measure, but the result of his political activities in the town. Bieluch was not given a hearing, nor was he asked about the allegations in the letter. When Bieluch asked for a copy of the letter, his request was declined. His new position in the Litchfield barracks was not a resident trooper position.

Bieluch filed this action under 42 U.S.C. § 1983 in August 1990, alleging violations of his first and fourteenth amendment rights. He originally sought monetary and injunctive relief against Sullivan in his individual and official capacities. After a three-day hearing, Bieluch's motion for a preliminary injunction was denied on October 4, 1990. The district court also dismissed Bieluch's claim for damages against Sullivan in his official capacity. After Bieluch retired from the police force in 1992, he dropped his claim for injunctive relief. With respect to the remaining claim for damages against Sullivan in his individual capacity, the district court granted summary judgment for Sullivan in November 1992, holding that qualified immunity protected Sullivan from liability.

Bieluch now appeals, claiming that in finding qualified immunity the district court did not properly balance his first-amendment interests against the state's interest in efficient law enforcement. More specifically, Bieluch claims that Sullivan's actions were not objec-

tively reasonable and that his summary dismissal based on mere concern about potential disruption of police functions, without evidence of actual interference and without affording Bieluch any opportunity to respond to the unsubstantiated charges, was not a sufficient basis on which to find qualified immunity at the summary judgment stage of this case. We agree.

## DISCUSSION

■■ Summary judgment is appropriate when no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. We review grants of summary judgment *de novo*, drawing all inferences in favor of the nonmoving party. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989). Therefore, Bieluch must have his allegations taken as true, and is entitled to receive the benefit of the doubt when his assertions conflict with those of Sullivan. *See Piesco v. City of New York, Dept. of Personnel*, 933 F.2d 1149, 1154 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991).

■■ The affirmative defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Whether qualified immunity is warranted "generally turns on the 'objective legal reasonableness' of the action". *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038 (quoting *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739). If the law claimed to have been violated was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his or her conduct. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39.

■■ Public employees do not relinquish their first-amendment rights when they be-

gin working for the government, *Rankin v. McPherson*, 483 U.S. 378, 383–84, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987); *Piesco*, 933 F.2d at 1155; nevertheless, the government does have an interest in regulating the speech of its employees that is significantly different from its interest in regulating the speech of the citizenry in general. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Due to the government's countervailing interests, the "clearly established law" surrounding first-amendment rights of public employees follows not a bright-line rule, but a balancing test.

> The problem in any case is to arrive at a balance between the interest of the [public employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.*

When the district court applied the *Pickering* balancing test for its summary judgment analysis, it concluded that Sullivan was entitled to qualified immunity because "a reasonable official would have found that Bieluch's First Amendment rights were outweighed by the government's interest in promoting effective law enforcement in New Hartford". Without any specific factual basis, the district court simply concluded that Bieluch's speech "threatened effective police operations". The court did not make any findings regarding whether Bieluch's activities harmed his working relationship with First Selectman Smith, whether any of the letter's allegations of misconduct were true, whether Bieluch's speech interfered with efficient government operations, whether Bieluch's speech was a motivating factor in Sullivan's decision to transfer him, or what Sullivan's intent was in transferring Bieluch.

■ The district court correctly acknowledged that Bieluch's speech was protected by the first amendment, but it did not accord it proper weight in the balancing test. To determine what degree of protection to give first-amendment actions by a public employee, the threshold question is whether the speech at issue addresses a matter of public

concern. *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896–97; *Piesco,* 933 F.2d at 1155. This is done by examining the form, content, and context of the statements, as revealed by the record as a whole. *Piesco,* 933 F.2d at 1155.

■ Bieluch's speech concerned tax expenditures, town budgets, school construction, and the right to petition for referenda—matters of utmost public concern. "[E]xpression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values'". *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) (quoting *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)). However, rather than weighing Bieluch's speech heavily in the balance, the district court treated it as if it, like the speech at issue in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), was only of limited public concern.

In *Connick,* an assistant district attorney, Sheila Myers, circulated a questionnaire among her co-workers soliciting their views on the office's transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in certain political campaigns. 461 U.S. at 141, 103 S.Ct. at 1686–87. She was fired later that day. The Court held that the only question in her questionnaire that touched upon a matter of public concern was the one asking the assistant district attorneys whether they "ever feel pressured to work in political campaigns on behalf of office supported candidates". The Court noted that Myers' superiors considered the questionnaire an act of "insubordination" that interfered with working relationships in the office. Since close working relationships were at issue and the vast majority of Myers' speech did not fall under the rubric of "public concern", the Court said that it was unnecessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action". *Id.* at 152; 103 S.Ct. at 1692.

Picking up this cue from *Connick,* the district court opined that since a reasonable official would have perceived that Bieluch's speech "threatened effective police operations", the government's interests outweighed Bieluch's first-amendment interests. However, the district court failed to heed *Connick*'s caveat that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern". *Id.* at 152, 103 S.Ct. at 1692.

■ Without question, Bieluch's speech "more substantially involved matters of public concern" than did Myers' questionnaire about internal office procedures in *Connick.* While Myers prepared and distributed her questionnaire *at the office,* exercised her right to speak *at the office,* and questioned an *office policy* that was being applied to her, Bieluch spoke at town meetings and was involved in community taxpayer organizations. While Myers' speech touched upon matters of public concern in only the "most limited sense", *id.* at 154, 103 S.Ct. at 1693–94, all of Bieluch's actions, in contrast, contributed to debate on public issues, the very kind of speech the first amendment was designed to protect. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. at 913, 102 S.Ct. at 3425–26; *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–70, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964). As we held in *Piesco,* if the employee's speech substantially involved matters of public concern, the government must make a stronger showing of interference with operations than occurred in *Connick.* 933 F.2d at 1159.

Sullivan claims on appeal that the district court found that Bieluch's political activities caused "actual disruption" in Bieluch's workplace. The district court never made such a finding. Because it was applying an "objective reasonableness" test, the district court felt that it was unnecessary to determine whether Bieluch's activities actually hampered law enforcement; instead, it found that Bieluch's speech "posed a potential threat" to police operations. Under *Piesco,* however, a potential threat could not outweigh Bieluch's first-amendment interests.

We therefore must determine whether the record supports a sufficient showing of interference with government operations to war-

rant a grant of summary judgment in favor of Sullivan. Although the qualified immunity defense turns on an objective test, rather than Sullivan's subjective intent, this does not bar an examination of the facts known to Sullivan at the time he decided to transfer Bieluch. The "reasonable official" standard merely precludes an inquiry into whether Sullivan thought that he might be violating Bieluch's first-amendment rights. For our analysis, the critical question is whether a reasonable official in Sullivan's position would believe that the state's interests outweighed Bieluch's interests.

Drawing all inferences in favor of Bieluch, we conclude that his conduct did not hamper the efficient operation of law enforcement in any way. First, Bieluch has an excellent professional record. He was evaluated twice a year, and in his twenty-three years as a Connecticut state trooper, he never received an unsatisfactory evaluation. Aside from the letter to Sullivan, none of Bieluch's superiors had ever received any complaints, either formal or informal, about Bieluch's qualifications, integrity, or performance as a police officer. At the July 13, 1990, meeting, Lieutenant Hiltz told Bieluch that he had been doing a good job as resident trooper of New Hartford and that he was not being transferred because of any suggested wrongdoing.

Second, Bieluch's working relationship with First Selectman Smith was unharmed. Sullivan's claim that Smith requested Bieluch's transfer is contradicted by testimony from Smith, himself, that he never made such a request. According to Smith, he thought sending the letter would prompt Bieluch's superiors to examine the ethical implications of Bieluch's political activities; he did not know if any of Bieluch's actions were in fact unethical. Although Smith said that he stopped trusting Bieluch, he also said that this did not affect their professional relationship. He met with Bieluch informally on a regular basis, and they never hesitated to meet whenever necessary. Smith testified that he felt that Bieluch was an effective, competent law enforcement official who was an asset to the town when he was a resident trooper. Furthermore, Smith testified he had never seen anything dishonest or deficient in Bieluch's performance as a resident trooper and had never disagreed with any law enforcement action that Bieluch had or had not taken.

Finally, Sullivan did not verify any of the allegations in the letter before he transferred Bieluch. He did not even ask Bieluch about them. Sullivan testified that the letter did not mention "anything that was serious enough to warrant a real big investigation". If we draw all inferences in favor of Bieluch, it appears that none of the letter's allegations of misconduct is true. Bieluch testified during the preliminary injunction hearing that he never solicited signatures for petitions, issued any material that contained a deliberate misuse of statistics, conducted association business from his office in Town Hall, or engaged in dishonest tactics in connection with the taxpayers' organizations. He did not personally approve all of the materials distributed by the two groups. With respect to parking his police vehicle at polling places, he said that he had never parked for longer than it took him to go inside and vote. His car was unmarked; it bore neither a police insignia nor flashing lights. As a resident trooper, Bieluch was permitted to drive his police vehicle twenty-four hours a day; in fact, troopers were encouraged to use the police vehicle in their off-duty hours, in case they needed to be recalled during an emergency.

Bieluch clearly had the right to express his views as an individual on public issues. A mere concern about public perception based on unverified statements by nine citizens is not sufficient to outweigh Bieluch's first-amendment interests. On the present record, it appears that Sullivan was not presented with any evidence that the state's law enforcement functions were being compromised, yet he transferred Bieluch summarily. Although Sullivan claims that he thought the transfer would allow Bieluch to continue being politically active in New Hartford, Bieluch was unable to attend any New Hartford Property Owners' Association meetings after his transfer to Litchfield, because he was assigned to the 4 p.m. to midnight shift.

We conclude that on the present state of the record it cannot be determined that a

reasonable official in Sullivan's position would believe that the state's interests outweighed Bieluch's interests. To hold otherwise would seriously undermine the first-amendment rights of public employees. Whenever a government employee became personally involved in a controversial public issue, those on the opposite side of the issue could get the employee transferred or discharged simply by expressing a concern to the employee's superior that government functions were being threatened. The superior could then summarily act on this "concern" without giving the employee an opportunity to respond or investigating into the truth of the allegations. This is not the type of official conduct that the doctrine of qualified immunity was designed to shield.

While summary judgment provides an expeditious way to dispose of insubstantial claims against government officials, see *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, Bieluch's claim warrants greater scrutiny. After he engaged in political speech, on the basis of concerns expressed by nine citizens, without verification of the allegations underlying those concerns, he was summarily transferred without any hearing and without even a review of his job performance. Because the law guaranteeing Bieluch's first-amendment rights was clearly established at the time of his summary transfer, it was inappropriate for this case to be resolved by summary judgment.

### CONCLUSION

The district court did not accord Bieluch's speech sufficient weight in the *Pickering* balancing test. Because Bieluch's speech must be afforded the highest degree of protection offered by the first amendment, the government must make a stronger showing than merely perceiving a potential "threat" to effective government operations, without verifying the underlying allegations or even affording him an opportunity to respond. Summary judgment was improper.

Reversed and remanded.

WHITMAN KNAPP, Senior District Judge, dissenting:

As the majority properly notes, the diatribe signed by nine citizens including the First Selectman contains many accusations that we must for present purposes deem to be have been unfounded. However, it sets forth two undisputed facts: (1) plaintiff has entangled the First Selectman in litigation; and (2) he conducted a vituperative campaign accusing him and his colleagues of, among other things, possible fraud.

In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), an almost unanimous Court, speaking through Justice Marshall, set forth a balancing test by which could be determined the circumstance under which a State employee could exercise first amendment rights in attacking his or her employer despite the danger of jeopardizing the State's interest in "promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1735. The Court intended its opinion to provide "general lines along which" such a determination should be made. *Id.* at 569, 88 S.Ct. at 1735.

Using the facts before it as illustrative, it emphasized that the statements of the employee whose case was under consideration were "in no way directed toward any person with whom [he] would normally be in contact in the course of his daily work"; and consequently that "no question of maintaining ... harmony among coworkers" was presented. *Id.* at 570, 88 S.Ct. at 1735.

Since our plaintiff's conduct was precisely the opposite of that described in Justice Marshall's guidelines, I can not see how a "reasonable person" in Sullivan's position would have "known" that plaintiff had a constitutional right which Sullivan was violating by his reaction to such conduct. See *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1972).

I am also troubled by the form of the majority opinion. It seems to me that the majority is actually saying that, based on all the facts developed in the course of about two years of litigation, it has concluded that Sullivan made a mistake in ordering plaintiff's transfer. I find little in the opinion directed to the question of what a reasonable person in Sullivan's position would have

"known" when the decision to effect the transfer was made.

Although the opinion recognizes (at page 671 lines 2–5) that the critical facts are those "known to Sullivan at the time he acted," it proceeds to base its findings upon facts largely developed in the course of the ensuing lawsuit.

I therefore respectfully dissent.