Monroe **HALE**, Plaintiff–Appellant,

v.

Louis **MANN**, Deputy Commissioner, sued in his individual capacity and The State of New York Office of Children and Family Services, Defendants–Appellees,

**Docket No. 99–7326.**

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1999

Decided May 25, 2000

Michael H. Sussman, (Stephen Bergstein, on the brief) Law Offices of Michael H. Sussman Goshen, N.Y. for Plaintiff–Appellant.

Marion R. Buchbinder, Assistant Attorney General of the State of New York (Eliot Spitzer, Attorney General, Edward Johnson, Deputy Solicitor General, & Michael S. Belohlavek, Assistant Attorney General, on the brief) New York, N.Y. for Defendants–Appellees.

Before: KEARSE, MINER, AND CABRANES, Circuit Judges.

Judge JOSÉ A. CABRANES files a separate opinion concurring in the opinion in connection with the dismissal of the Family and Medical Leave Act claim, but dissenting from the reinstatement of the First Amendment claim.

MINER, Circuit Judge:

Plaintiff–Appellant Monroe Hale ("Hale") appeals from a summary judgment in favor of the defendants-appellees, The State of New York Office of Children and Family Services ("OCFS") and Louis Mann ("Mann"), a Deputy Commissioner in OCFS, entered in the United States District Court for the Southern District of New York (Brieant, J.). In 1998, Hale was terminated from his position as Youth Facility Director ("Director") of the New York Secure Center in Goshen, New York ("Goshen Facility"). He subsequently brought suit alleging that he had been fired in violation of his rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., and the First Amendment.[1] On February 25, 1999, the district court granted the defendants' motions for summary judgment, concluding that Hale's post-FMLA leave firing did not violate the FMLA and that Hale's firing was not motivated by any protected speech on his part.

For the reasons that follow, we affirm in part, vacate in part, and remand for fur-

---

**1.** His First Amendment claim was brought    pursuant to 42 U.S.C. § 1983.

ther proceedings consistent with this opinion.

## BACKGROUND

In 1991, Hale was hired as Director of the Goshen Facility, an 85–bed residential youth facility operated by OCFS. OCFS' responsibilities include providing care, treatment, and security for offenders placed in its custody by the courts. At all times pertinent to this appeal, the Goshen Facility housed male juvenile delinquents. As Director, Hale served in a policy influencing position held at the pleasure of the Governor and was responsible for the administration and management of the Goshen Facility, including its effective implementation of safety and security measures. Hale's position also required him to establish a relationship with the community and seek to maintain "harmonious community relations."

According to Hale, conditions at the Goshen Facility were in disarray when he took over; the staff did not feel safe, and assaults on the residents and staff were common. After Hale assumed his duties, funding for the Goshen Facility decreased and the residents became more violent, thus prompting increased security concerns.

Starting in 1995, OCFS began to alter the procedures employed at the Goshen Facility. OCFS contends that it was Hale's failure to implement these procedures which led to continued breakdowns in security and Hale's eventual termination as Director. On the other hand, Hale contends that OCFS policies led to problems at the Goshen Facility and that his discharge was due to his objections to OCFS' misguided policies. In any event, all seem to agree that conditions at the Goshen Facility had become less than desirable by late 1997—numerous security breakdowns and altercations among the residents were occurring at that time.

In January 1997, OCFS personnel conducted an unannounced search of the Goshen Facility as part of an "effort to address the management and safety issues" that were arising at the Facility. OCFS asserts that numerous problems were discovered: the presence of contraband—sharp metal and cash in resident's rooms and tools and screws in the vocational area; the room designated as the "key room" was in disarray; and residents possessed gang-related material. Moreover, OCFS personnel observed that uncooperative residents were allowed out of their rooms unaccompanied by staff, potentially leading to assaults. The search also revealed concerns about cleanliness, the job performance of one of Hale's assistants, and overall lack of supervision. Due to the results of this search, one of Deputy Commissioner Mann's assistants, Brenda Flanagan ("Flanagan"), spoke with Hale. Mann, via Flanagan, directed Hale to initiate new policies at the Goshen Facility. In particular, Mann asserted that Wing 1 should no longer be used to counsel disruptive residents, but should instead be used only for residents restricted to inroom confinement. The defendants assert that Hale failed to carry out their policies and initiatives for dealing with these problems.

On September 20, 1997, an affray broke out at the Goshen Facility, injuring staff. The fracas generated negative press coverage concerning violence at the Facility, prompting political debate about conditions there. By letter dated September 23, 1997, Robert P. Pollack, one of Mann's subordinates, informed Hale that Mann wanted Hale to conduct an investigation into the September 20, 1997 incident. Seeking to respond to Mann's request, Hale asked a staff member, Stephen Langbein, to investigate and report.

Langbein's investigation revealed that "agency policies and practices, adopted and implemented by . . . Mann, had significantly contributed to a decline in staff safety." Hale Affidavit at 19. Langbein's written report highlighted a factor that Hale had indicated to his superiors was

contributing to the unsafe conditions at the Goshen Facility: OCFS' failure to deal "with some of the most volatile, aggressive youths in the state." The report was specifically critical of policy changes established by Mann with regard to the use of Wing 1 at the Goshen Facility. It recommended that OCFS permit the staff at the Goshen Facility to resume their prior use of Wing 1 for counseling disruptive residents. The report also questioned OCFS' policy with regard to youths over the age of eighteen.

In response to a previously submitted incident report, the Commission of Correction ("Commission"),[2] by letter dated October 6, 1997, requested (1) the investigative report regarding the September 20, 1997 incident; (2) a breakdown of all incidents at the Goshen Facility between January and October of 1997; and (3) the number of residents moved to jail as a result of the incident. Langbein had submitted his report to Hale via an October 20, 1997 memorandum. By letter dated November 10, 1997, Hale submitted the report to Steve Mann ("S.Mann"), one of Mann's subordinates. Aware of the ongoing public debate over safety at the Goshen Facility, and presumably in response to the Commission's prior request, Hale appears to have also sent a copy of the report to the Commission.

By letter dated November 24, 1997, S. Mann wrote Hale that Langbein's report was unacceptable because it made "numerous editorial comments" and included "thoughts and concerns" as opposed to containing "only factual information." Hale asserts that his superiors were hostile to the "thoughts and concerns" expressed in the Langbein report, which reflected Hale's views as conveyed in prior letters to his supervisors[3] and in discussions with Langbein, and that he forwarded the report because he wanted to let the Commission and others know "what really was happening at the facility." According to Hale, the views expressed in the report addressed matters that were common to all OCFS facilities.

Apparently upset about the content of the report that Hale sent to the Commission, S. Mann told Hale that he should have first forwarded the report to central administration. S. Mann further stated that Hale was "this close" (while holding his fingers approximately one inch apart) to not having a job. According to Hale, this was the first time that he was threatened with termination, and it occurred immediately after "Mann became incensed with [Hale's] reporting the September 20, 1997 incident to the Commission on Corrections."

In December 1997, Hale took sick leave for job-related stress. After Hale began his stress-related leave, S. Mann determined that Hale would be considered on FMLA leave as of January 1, 1998.

Concerned about what were perceived as the continuing problems of the Goshen Facility, OCFS conducted another unannounced search of the Goshen Facility on January 13 and 14, 1998. Because of his leave, Hale was absent from the Goshen Facility at the time this search occurred. It had been approximately six weeks since he had taken sick leave. According to

---

2. The Commission is entrusted with a wide variety of tasks in aid of the administration of correctional facilities in New York state. Among other things, it must advise the governor concerning appropriate correctional facility policies; visit, inspect, and appraise the management of state correctional facilities; close unsafe correctional facilities; and promulgate appropriate rules and regulations for the care of inmates. See N.Y. Correct. Law § 45 (McKinney 1987 & Supp.1999–2000). It consists of three members who oversee the operations of state and local correctional facilities. See McNulty v. Chinlund, 89 Misc.2d 713, 392 N.Y.S.2d 790, 791 (N.Y.Sup.Ct. 1977).

3. For example, in a September 16, 1997 memorandum, Hale had stated that "these residents who are never going to benefit from being in our system ... are like a cancer that disrupts a facility's environment. They must be surgically removed ..."

Hale, the search did not result in any disciplinary measures against other staff members, nor were any weapons or illegal contraband found. However, the defendants contend that the search revealed that "Goshen was still 'dirty' 'unkempt' and 'disorganized' . . ., and contraband was abundant both in common areas and the residents' rooms."

Allegedly because of his dismay over the results of this search, Mann subsequently stated to Flanagan that Hale "had to go" and by letter dated January 15, 1998 informed Hale that he was terminated as Facility Director, effective January 21, 1998. After objections by Hale's attorney and Flanagan concerning Hale's FMLA status, Mann changed the effective date of termination to March 25, 1998, the date when Hale's FMLA leave expired. Because he held a tenured status with OCFS, Hale's termination resulted in demotion, and he subsequently was reassigned to an inferior job, with a lower salary and fewer responsibilities, in New York City, far from his home.

On March 2, 1998, Hale brought suit alleging that his FMLA and First Amendment rights had been violated by his termination as Director. In its answer, OCFS invoked the doctrine of sovereign immunity with regard to the FMLA claim. At the close of discovery, OCFS and Mann moved for summary judgment, asserting that Hale's claims were without merit and that defendant Mann was entitled to qualified immunity in any event with regard to the First Amendment claim. The district court granted the defendants' motion on February 25, 1999, finding no genuine issue of material fact as to either claim. With respect to the FMLA claim, the court held that the statute does not prevent termination following the completion of FMLA leave:

> The right to be employed during the FMLA leave period extends to protect an employee's benefits and salary during the leave period. This Mr. Hale received. The statute does not prevent

his termination following the completion of his leave where, as here, he holds a noncompetitive policy position with no expectation of permanent employment, and defendants articulate a nonpretextual reason for his removal based on events which occurred prior to his going on leave. The statute gives no greater job security than that to which the employee would have been entitled prior to taking leave.

The court also rejected Hale's First Amendment claim, noting that the Langbein report was not prepared by Hale and that Langbein, himself an OCFS employee, had not been subjected to retaliation. The court concluded that "there [wa]s no evidence that his First Amendment rights to speak out on matters of public concern were a motivating factor in his demotion." Because the court found no evidence to support a jury finding in favor of Hale's claims, the court found it unnecessary to reach Mann's qualified immunity defense. This appeal followed.

## DISCUSSION

■ Summary judgment is only appropriate when the moving party shows that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). Applying a *de novo* review on appeal, we "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor" to determine whether the district court's grant of summary judgment was proper. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993); *see Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 453–54 (2d Cir.1999); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 466–67 (2d Cir.1995).

### The FMLA Claim

■ Before discussing Hale's contentions under the FMLA, we must address

OCFS' contention that it is entitled to Eleventh Amendment immunity from suit under the FMLA. This assertion of sovereign immunity implicates jurisdictional concerns. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (the Eleventh Amendment "restricts the judicial power under Article III"); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (the jurisdictional bar of Eleventh Amendment applies regardless of the nature of the relief sought); *cf. United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) ("[T]he terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit."). *But see Parella v. Retirement Bd. of the Rhode Island Employees' Ret. Sys.,* 173 F.3d 46, 53–57 (1st Cir.1999) (finding that assertion of Eleventh Amendment immunity does not implicate Article III jurisdiction); *cf. Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (finding that Eleventh Amendment immunity may be waived), *superseded in other respects by* Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C. § 2000d–7. Our review of the Eleventh Amendment issue is *de novo.* *See Muller v. Costello,* 187 F.3d 298, 307 (2d Cir.1999).

In *Seminole Tribe,* the Supreme Court articulated a two-part test for determining whether an act of Congress abrogates states' Eleventh Amendment immunity. The test asks (1) whether Congress has unequivocally declared an intent to abrogate states' immunities and (2) whether Congress has acted pursuant to a valid exercise of its power. *See* 517 U.S. at 55, 116 S.Ct. 1114.

■ Both the FMLA and the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C § 201 *et seq.,* provide that an action may be maintained for violations of each respective statute "against any employer (including a public agency) in any Federal or State court of competent jurisdiction." 29 U.S.C. § 216(b); 29 U.S.C. § 2617(a)(2). Congress' use of this identical language from the FLSA in the later passed FMLA causes us to turn to our interpretation of Congress' abrogation intent in *Close v. New York,* 125 F.3d 31, 36 (2d Cir.1997). In *Close,* we held that this language in the FLSA evidenced "a clear intent to abrogate the States' sovereign immunity by allowing suit in federal courts." *Id.* We are convinced that Congress' use of the same language in the FMLA similarly reveals a clear intent to abrogate Eleventh Amendment immunity and thus satisfies the first prong of the *Seminole Tribe* test. *See McGregor v. Goord,* 18 F.Supp.2d 204, 207 (N.D.N.Y.1998).

However, the second prong is more problematic. After *Seminole Tribe,* the only potential source for congressional abrogation is the Fourteenth Amendment. *See Close,* 125 F.3d at 37–38. As we recently explained in *Muller,* 187 F.3d at 308,

Section 5 of the Fourteenth Amendment empowers Congress to enact appropriate legislation to enforce its substantive provisions, including the Equal Protection Clause. A statute is appropriate legislation to enforce the Equal Protection clause if it is plainly adapted to that end and if it is not prohibited by but is consistent with the letter and spirit of the Constitution. *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) ... [H]owever, ... Congress's power under § 5 must be linked to constitutional injuries and there must be a "congruence and proportionality" between the harms to be prevented and the statutory remedy. [*City of Boerne v. Flores,* 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ]. This "proportionality" analysis has been further refined by *Florida Prepaid Postsecondary Education Expense Board [v. College Savings Bank ]:* "for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions,

and must tailor its legislative scheme to remedying or preventing such conduct." 527 U.S. 627, 119 S.Ct. [2199,] 2207, 144 L.Ed.2d 575 [ (1999) ]. (some internal quotation marks, alterations, and footnotes omitted).

In the opening section of the FMLA, Congress found that "due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men." 29 U.S.C. § 2601(a)(5). Congress further found that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods," *id.* § 2601(a)(4), and that "employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender," *id.* § 2601(a)(6). In light of these findings, Congress passed the FMLA:

(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;

(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition;

(3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers;

(4) to accomplish the purposes described in paragraphs (1) and (2) in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and

(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause.

29 U.S.C. § 2601(b).

The FMLA generally requires covered employers to grant employees who have worked for twelve months (or 1250 hours in twelve months) up to twelve weeks' leave during any twelve month period for, *inter alia,* "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It also protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking of leave pursuant to the FMLA. *See* 29 U.S.C. § 2614(a)(1); *see e.g., Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319 (5th Cir.1999). These are the rights articulated in the FMLA that are at issue here.

The question before us is whether this grant of twelve weeks' leave to deal with one's own serious health condition is "congruent" and "proportional" to the goal of allowing family leave while "minimiz[ing] the potential for employment discrimination on the basis of sex." 29 U.S.C. § 2601(b)(4). We are compelled to answer in the negative. We recognize that it is for Congress to assess in the first instance what legislation is needed to secure the rights guaranteed by the Fourteenth Amendment and that in order "to deter violation of rights guaranteed thereunder," Congress may "prohibit[ ] a somewhat broader swath of conduct." *Kimel v. Florida Bd. of Regents,* —— U.S. ——, ——, 120 S.Ct. 631, 644, 145 L.Ed.2d 522 (2000). However, the legislation here sweeps too wide. In the final analysis, the insurmountable hurdle in this case is the entirely gender-neutral focus of the rights conferred by the FMLA provisions at issue.

In light of Congress' failure to specifically find that women are disproportionately affected by "serious health conditions," this gender-neutral grant of leave is over-

broad. There is no evidence that this conferment of federally protected leave is tailored to remedy sex-based employment discrimination. Instead, it seems grossly incongruent and disproportionate to try to remedy *intentional* sex discrimination with a statute that, in the words of the Seventh Circuit, "creates substantive rights" and "statutory entitlements" that do not permit an employer to "defend by saying that it treated all employees identically." *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712 (7th Cir.1997). By making a "substantive change" in state employees' rights, Congress has exceeded its power to "remedy or prevent unconstitutional actions." *City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157; *see also id.* at 527, 117 S.Ct. 2157 ("Any suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law."). The rights conferred by the FMLA in this case are "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 532, 117 S.Ct. 2157.

Moreover, "[s]erious health conditions are not necessarily related to family and gender discrimination." *Garrett v. University of Alabama at Birmingham Bd. of Trus.*, 193 F.3d 1214, 1220 (11th Cir.1999), *cert. granted in part,* —— U.S. ——, 120 S.Ct. 1669, 146 L.Ed.2d 479 (2000). While the Court has "acknowledge[d] the necessity of using strong remedial and preventive measures to respond to ... racial discrimination," these measures have often been supported by direct and tangible evidence that they were necessary to prevent the harm sought to be prevented. *City of Boerne*, 521 U.S. at 526, 117 S.Ct. 2157; *compare Oregon v. Mitchell*, 400 U.S. 112, 132, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) ("Congress had before it a long history of the discriminatory use of literacy tests to disenfranchise voters on account of their race.") (Black, *J.*, announcing the judgment of the Court and concurring), *super-*

*seded in respect to minimum age by* U.S. Const. amend. XXVI.

Thus, we find that Congress did not have the authority to abrogate the sovereign immunity of the states on claims arising under the provisions at issue here. Its attempt to do so was not congruent or proportional to the harms targeted by the Fourteenth Amendment. It is important to note, however, that we only pass on the particular provisions at issue here, medical leave to deal with one's own "serious health condition," 29 U.S.C. § 2612(a)(1)(D), and the related retaliation section, *see id.* § 2614(a)(1), at least when used in conjunction with Section 2612(a)(1)(D).

Although our resolution of the Eleventh Amendment issue precludes the portion of Hale's suit under the FMLA, we briefly address the merits, or in this case lack thereof, in the alternative.

While the FMLA caselaw in this circuit is sparse, we recently addressed an FMLA claim of improper employment discharge in *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155 (2d Cir.1999). In *Sarno*, the plaintiff employee went on FMLA leave due to a hernia condition. Following the twelve week period permitted by statute, he was unable to return to work and was terminated. He subsequently brought suit, alleging that his rights under the FMLA had been violated. We affirmed the district court's grant of summary judgment for the defendant corporation, finding that Sarno's termination at the end of that period "did not infringe his FMLA rights because it [was] ... undisputed that ... he [was] unable to perform the essential functions of his ... position." *Id.* at 161. We also considered and rejected Sarno's claim that his FMLA rights were infringed by the employer's failure to inform him that the FMLA entitled him to a leave of up to twelve workweeks. *See id.* at 161–62.

In the present case, Hale alleges that he was fired in violation of the FMLA.

However, we find this claim without merit. To the extent that he argues that he was improperly fired while on FMLA leave status, we find that the facts of this case are clearly to the contrary. Instead, the evidence before the district court established that Hale's termination as Director occurred after his FMLA leave ended. His receipt of a letter indicating that his discharge was effective on January 15, 1998 is without significance, because OCFS subsequently changed the effective date of his termination.

Moreover, to the extent that Hale contends he was fired in retaliation for his FMLA leave, we also find that contention unsupported by evidence sufficient to create a genuine issue of material fact. Although the true reason for his dismissal is in dispute, *see infra,* Hale has presented no evidence indicating that the termination decision was related to his FMLA leave. In sum, Hale has presented no facts in support of any FMLA violation, rendering it unnecessary for us to address the proper scope of the FMLA inquiry and whether the *McDonnell Douglas* burden shifting test applies in FMLA retaliatory discharge cases in this circuit.

*The First Amendment Claim*

■ "[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Nevertheless, a government employer has an interest in promoting efficient public service by its employees and may regulate its employees' speech. *See id.* Because resolution of the conflict between these two competing interests involves a fact-specific inquiry, the Supreme Court has refused to "lay down a general standard against which all such statements may be judged." *Pickering,* 391 U.S. at 569, 88 S.Ct. 1731. Instead, the Court has instructed us to weigh the interests of the

employee "in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. 1731.

■ Preliminary to this balancing process, "a plaintiff ... must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). If the plaintiff meets the burden of establishing these factors, the burden shifts to the employer to establish that "it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" *Id.* (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Whether an employee's speech addresses a matter of public concern and is thus protected under the First Amendment is "one of law, not fact." *Morris,* 196 F.3d at 110 (citing *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684). On the other hand, if there are significant questions as to whether an employer would have discharged an employee but for his/her speech, summary judgment is precluded. *See id.*

In our case, the parties dispute whether Hale engaged in protected speech and whether his termination as Director was motivated by his speech. As an initial matter, defendants ask us to determine, in accordance with the decision of the district court, that Hale's forwarding of the Langbein report is not protected under the First Amendment because he did not write the report.

■ After reviewing the record, we find, contrary to the district court below, that a genuine issue of material fact exists with regard to whether Hale adopted the report and made it speech of his own by forward-

ing the Langbein report to the Commission. There is evidence in the record that Hale objected to his superiors' policies. A trier of fact could conclude that he voiced these concerns to management directly and via his submission of the Langbein report to the Commission. Although Mann assigned to Hale the task of preparing the report, and Hale delegated the task to Langbein, Hale may have adopted the Langbein report as his own. A jury could find that by forwarding the unaltered report, Hale endorsed the views expressed in it and thereby engaged in independent expression. In support of this position, there is evidence that Hale forwarded the Langbein report by a transmittal letter over his signature to Mann (and to the Commission) precisely because he wanted to influence OCFS policy.[4]

On the other hand, a rational factfinder could also find that the evidence on this point is insufficient and that Hale was simply following orders, not engaging in independent expression. The district court impermissibly resolved this issue on summary judgment; we merely resurrect it for the factfinder to decide.

■ Next, we address whether the report, if adopted by Hale, addressed a matter of public concern. Although the district court answered this question in the negative, we find that determination erroneous. We conclude that as a matter of law, the report addressed a matter of public concern: the proper administration of State facilities for the incarceration of juveniles. *See Morris*, 196 F.3d at 110 ("As a general rule, speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment.") (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684); *Dangler v. New York City Off Track Betting Corp.*, 193

F.3d 130 (2d. Cir.1999) (contacting OTB Inspector General about alleged improprieties at OTB); *Lewis v. Cowen*, 165 F.3d 154 (2d Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 70, 145 L.Ed.2d 60 (1999) (objections to new lottery policies voiced to Connecticut Gaming Policy Board by lottery official); *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir.1994) ("speech advocating the legalization of marijuana, criticizing national drug control policy, and debating civil disobedience on its face implicates matters of public concern"); *Bieluch v. Sullivan*, 999 F.2d 666, 671 (2d Cir.1993) (Defendant's "speech concerned tax expenditures, town budgets, school construction, and the right to petition for referenda—matters of utmost public concern."). This matter affected not just internal Goshen Facility administration, but, as shown by the Commission's consideration of the issues raised in the Langbein report, issues that were the subject of ongoing public discourse. Accordingly, if the factfinder determines that Hale adopted the report when he forwarded a copy of the report to his superiors, then the report, as a matter of law, contains protected First Amendment expression addressing a matter of public concern.

■ Nevertheless, we must still address whether Hale's speech was the cause of his termination. After reviewing the record, we find that there is also a genuine issue of material fact as to whether Hale's firing was motivated by Hale's unacceptable administration of the Goshen Facility or by Hale's protected speech in objecting to the policies and practices governing the operation of the Goshen Facility.

The defendants have submitted evidence that Hale did not properly implement appropriate policies at the Goshen Facility. They contend that he was terminated be-

---

4. In his affidavit in opposition to defendants' motion for summary judgment, Hale stated, Lou Mann and Steve Mann both knew that I shared the views Langbein expressed and the act of my forwarding the report to the Commission on Corrections was intended to divulge to that agency the disputes I had with the policies of our agency on matters of considerable public importance. I was not required to send this document to the Commission.

cause of the deteriorating conditions at the Facility, as demonstrated in the January 1997 search and more particularly the January 1998 search. The defendants present other evidence indicating that their disagreements with Hale predated the submission of the Langbein report and that, after the troubling January 1998 search, Mann felt Hale needed to be terminated as Director.

On the other hand, Hale has submitted sufficient evidence to create a jury question as to the true reason for his dismissal. Most significantly, Hale has presented evidence that although his superiors may have been dissatisfied with him for an extended period, the first suggestion of terminating him as Director occurred immediately after the Langbein report was submitted to the Commission. He also presents evidence indicating that the results of the January 1998 search were not as disturbing as the defendants portray and thus that the actual reason for his dismissal may have been based on the Langbein report. Although the defendants have catalogued many deficiencies uncovered during the searches, the timing of the termination decision, immediately after submission of the Langbein report, casts some doubt on this explanation.

We note that there is no allegation in this case that the submission of the Langbein report disturbed the normal operation of OCFS, or more particularly the Goshen Facility, so as to implicate OCFS' interest in promoting the efficient provision of public services. The defendants have merely asserted that they fired Hale because of

his inability to appropriately manage the Goshen Facility and that if he engaged in protected speech, no causal connection exists between that speech and his termination. Hence, we need not weigh Hale's free speech interest against his public employer's efficiency interest under the balancing test established in *Pickering*. Cf. *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 139–40 (2d Cir. 1999) (addressing the "defendants' contention that they were entitled to fire [the plaintiff] because his accusations of wrongdoing were inherently disruptive."); *Lewis v. Cohen*, 165 F.3d 154, 164 (2d Cir.1999) (accepting the defendants' claim that their "interest in the effective and efficient operation of the [Connecticut Division of Special Revenue] outweighed [the plaintiff's] First Amendment interest").[5]

Lastly, we take no position on the defendants' claim of qualified immunity, although we are skeptical of its viability in light of the nature of allegations at issue. Cf. *McEvoy v. Spencer*, 124 F.3d 92, 104 (2d Cir.1997) (finding that the defendants were entitled to qualified immunity on First Amendment claim because of the unsettled status of the law at the time of the alleged violation).

## CONCLUSION

Since there are genuine issues of material fact concerning Hale's adoption of the Langbein report as his own expression and the reason for Hale's dismissal as Director that preclude summary judgment, we va-

5. We also note that the defendants have not characterized Hale as a policymaker nor argued that they could demote him because of that status. Instead, they have merely characterized Hale's position as a *"policy-influencing* position, held at the pleasure of the Governor," and never linked up that purported status with their termination decision. (emphasis added). Moreover, Hale's possible status as a policymaker was not addressed by the district court and, if raised, is more properly left for that court to address on remand. In the event it is determined on remand that Hale was a policymaker, the defendants

would still have to establish that they properly demoted him, since a policymaker may still be entitled to First Amendment protection for his speech. See *Lewis*, 165 F.3d at 162 ("The policymaking status of the discharged or demoted employee is very significant in the *Pickering* balance, but not conclusive.") (alterations omitted) (quoting *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir.1997)). See also 124 F.3d at 103 ("The more the employee's job requires ... policymaking ..., the greater the state's interest in firing her for expression that offends her employer.") (alteration omitted).

cate the summary judgment insofar as it pertains to the First Amendment claim and remand for resolution of that claim. Because OCFS is entitled to Eleventh Amendment immunity on the FMLA claim, we affirm, on different grounds, the dismissal of that claim.

JOSÉ A. CABRANES, Circuit Judge, concurring in part and dissenting in part:

I join the majority opinion insofar as it addresses Hale's claim under the Family and Medical Leave Act ("FMLA"), affirming the judgment of the District Court on the grounds that the District Court lacked jurisdiction over the claim and that, in any event, the claim is devoid of merit. I respectfully dissent, however, from the majority's conclusion that the District Court improperly granted summary judgment on Hale's § 1983 retaliatory demotion claim. That claim is based on the proposition that a person who merely forwarded a report, as required, lost his job as a result, even though the author of the report suffered no adverse consequences.

To prevail on his § 1983 claim, Hale must show that: (1) his conduct is entitled to First Amendment protection; and (2) defendants' conduct was motivated by, or substantially caused by, Hale's exercise of his protected free speech rights. *See, e.g., Hankard v. Town of Avon*, 126 F.3d 418, 421–22 (2d Cir.1997). I do not believe that Hale has satisfied the first element, because the "speech" for which he claims defendants retaliated was not protected by the First Amendment.

The majority states:

A jury could find that by forwarding the unaltered [Langbein] report, Hale endorsed the views expressed in it and thereby engaged in independent expression. In support of this position, there is evidence that Hale forwarded the Langbein report by a transmittal letter over his signature to Mann (and to the [New York State] Commission [of Correction]) precisely because he wanted to influence [Office of Children and Family Services] policy.

*Supra at* 71. I find no support in the record for the conclusion that Hale "engaged in *independent* expression" in connection with the Langbein report. Hale admits that he did not contribute to the preparation of the report. Nothing in the three-page report indicates that it conveys Hale's views. Nor does the transmittal memorandum to which the majority refers offer any indication that Hale endorsed the policy prescriptions set forth by Langbein—who was not punished despite having authored the report that Hale claims his superiors found so objectionable. All Hale did, then, was comply with a direct written request from the Commission to forward for its review a copy of the report. Critically, the majority opinion does not mention Hale's admission that he believed he was *required* to turn over the report in response to the Commission's request.[1] Since Hale believed he had no choice but to forward the report, and since neither

---

1. Specifically, the following colloquy took place at Hale's deposition on September 9, 1998:

Q: Did you ever write to the commission or speak to anyone there and ask them why they wanted all these reports?

Hale: No. There was no need to ask them why. I was—they are an oversight agency. *Whatever requests they make we have to provide.*

(emphasis added). Obviously, this admission stands in stark contrast to the self-serving affidavit from which the majority quotes. *Supra at* 71 n. 4. Hale submitted that affidavit, in opposition to defendants' motion for summary judgment, approximately *three months after* he had been deposed. In light of this temporal proximity, it is apparent that Hale's sudden reversal was engendered by the necessities of his position in connection with the pending motion, and that the relevant statement in the affidavit is not credible. *See, e.g., Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir.1995) (" '[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.' ") (quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987)).

the report nor his brief transmittal memorandum refers to his own views concerning Langbein's policy prescriptions, I do not see how it is possible to say that Hale "engaged in independent expression" by forwarding the report. Absent a demonstration that Hale engaged in protected speech, the judgment of the District Court granting defendants' motion for summary judgment and dismissing the § 1983 claim should be affirmed.

Moreover, even if it could be said that Hale had expressed himself by forwarding the report, defendants would be entitled to summary judgment. Less than a year ago, we explained that "we are most doubtful that the Constitution *ever* protects the right of a public employee in a policymaking position to criticize h[is] employer's policies or programs simply because [h]e does not share h[is] employer's legislative or administrative vision." *Lewis v. Cowen,* 165 F.3d 154, 165 (2d Cir. 1999) (quoting *Moran v. State of Washington,* 147 F.3d 839, 850 (9th Cir.1998) (emphasis added)). I believe this situation falls under *Lewis:* the record is clear that Hale was a policymaking public employee, who asserts that he was demoted in retaliation for having criticized his employer's policies. In my view—and in the views of our Court in *Lewis* and the Ninth Circuit in *Moran*—the long reach of the First Amendment does not extend so far as to protect the jobs of non-civil service, policymaking public employees who insist on attacking the policies implemented by their superiors.

The job in which Hale served—Youth Facility Director 3 ("YFD3")—clearly qualifies as a policymaking position under the standard we have established.[2] In determining whether an employee is a policymaker, we consider several factors, including

whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders. This list is not exhaustive, but instead serves as a guide; no one factor or group of factors is always dispositive.

*Butler v. New York State Dep't of Law,* 211 F.3d 739, 744 (2d Cir.2000) (quoting *Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir.1994)). First, as a YFD3, Hale served at the pleasure of the Governor and was not entitled to civil service protection.[3] Second, the job requirements for a YFD3 demonstrate that the position demands technical expertise, including "good knowledge of principles of general, adolescent and abnormal psychology," "good knowledge of social casework techniques," and "good knowledge of counseling techniques." Third, a YFD3 directs the operations of a secure facility with 50–199 employees and a bed capacity of 50–99, thereby "control[ling] others."

Turning to the remaining four factors, we have noted that they "attempt to define the contours of a zone inside which governmental decisions are made," and "encompass a principle upon which this circuit has placed primary importance: whether the employee in question is empowered to act and speak on behalf of a policymaker, especially an elected official." *Gordon v.*

---

**2.** We have noted that "[i]t is beyond cavil that an appellate court may affirm the judgment of the district court on any ground appearing in the record." *Shumway v. UPS, Inc.,* 118 F.3d 60, 63 (1997). As the facts concerning Hale's responsibilities as a YFD3 were in the record before the District Court, I see no need to remand for consideration of whether Hale was a policymaker.

**3.** We have recognized that "New York has considered many of the same criteria for non-civil service status as does a court in determining whether a position is exempt from First Amendment protection." *Regan v. Boogertman,* 984 F.2d 577, 580 (2d Cir.1993).

*County of Rockland,* 110 F.3d 886, 890 (2d Cir.1997). In the instant case, facility directors are required to "serve as effective spokespersons in the community for the facility and [OCFS]." Among their specific responsibilities, facility directors must: (1) determine when youth are to be discharged; (2) meet and correspond with parents of youth to advise them of the progress of their children; (3) meet and deal with the members and representatives of the community surrounding the facility to influence them to accept and cooperate with facility programs; (4) meet with members of the community who have been damaged by the actions of facility residents, to learn of the damage and arrange restitution where necessary; and (5) authorize expenditure of monies for all items purchased by the facility. Hale's decisions concerning when to discharge youth and his representation of the Goshen Secure Center in dealings with parents as well as members of the community clearly placed him within the "zone inside which governmental decisions are made." Indeed, the first of these responsibilities (the power to decide when to discharge detained youth), standing alone, demonstrates that Hale acted as a policymaker. The added emphasis on interaction with the public further reinforces this conclusion, indicating a general perception of a YFD3 as a policymaker. *Cf. Butler* at 743–45 (finding that a Deputy Bureau Chief of New York State Department of Law, who regularly appeared in state and federal court, served in a policymaking position); *Adler v. Pataki,* 185 F.3d 35, 46 (2d Cir.1999) (Deputy Counsel of the New York State Office of Mental Retardation and Developmental Disabilities, who represented the agency in administrative and interdepartmental proceedings); *Bavaro v. Pataki,* 130 F.3d 46, 50–51 (2d Cir.1997) (associate and assistant counsel in the New York State Department of Health, who represented the state before the Board of Professional Medical Misconduct); *Vezzetti,* 22 F.3d at 486 (Orangetown Highway Superintendent, who frequently made public speeches); *Regan,* 984 F.2d at 579–81 (Deputy Tax Receiver of Islip, who attended Town Board meetings on the receiver's behalf).

The majority attempts in a footnote to avoid the obvious implication of the clear statement on this point in *Lewis,* claiming that "defendants have not characterized Hale as a policymaker.... Instead, they have merely characterized Hale's position as a *policy-influencing* position, held at the pleasure of the Governor...." *Supra* at 71 n. 4 (emphasis in original) (internal quotation marks omitted). First, there is no support in our caselaw for this novel distinction between policymakers and mere "policy-influencers." The fact that Hale reported to others does not preclude his having served in a policymaking position. *Cf. Butler,* 211 F.3d at 744 (stating that the Court was "not persuaded by [plaintiff's] argument that she was not a policymaker because she had to consult her superiors or clients on policy issues. The issue is not whether [plaintiff] independently made policy from day to day, but rather what the general required duties of her position were."). I see no reason to create some new category of public employee when there already exist criteria to distinguish policymakers from other public employees—criteria which the majority fails to mention in the course of reviving Hale's retaliation claim.

In addition, it is undisputed that Hale was notified in a 1994 letter from OCFS that his "position ha[d] been designated as policymaking" for financial disclosure purposes. Remarkably, this letter is cited in defendants' brief at the conclusion of the very sentence relied upon by the majority to claim that defendants never asserted that Hale was a policymaker, but rather a "mere policy-influencer." Accordingly, the record does not support the contention that OCFS did not consider Hale a policymaker; indeed, the record clearly supports the contrary conclusion.

To summarize: I join the majority opinion with respect to Hale's FMLA claim. However, I would affirm the District Court's decision granting defendants' motion for summary judgment on plaintiff's § 1983 claim, both because plaintiff has not offered any evidence that he engaged in protected expression and because, even if he had, defendants were entitled, following our recent decision in *Lewis*, to remove him from his policymaking position for criticizing his superiors' policies. Accordingly, I dissent from so much of the majority opinion as holds otherwise.