**Maxine MEHUS, Plaintiff,**

v.

**EMPORIA STATE UNIVERSITY, Defendant.**

**No. CIV.A. 03–2066–KHV.**

United States District Court, D. Kansas.

Jan. 15, 2004.

---

R. Denise Henning, Stephen R. Bough, Henning & Bough, PC, Kansas City, MO, for Plaintiff.

William Scott Hesse, Office of Attorney General, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Maxine Mehus brings suit against Emporia State University, alleging that it discriminated against her and subjected her to a hostile work environment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d). This matter comes before the Court on the *Motion To Dismiss* (Doc. # 6) which Emporia State University filed June 25, 2003, and its *Motion To Quash Summons, Service Of Summons And Motion To Dismiss* (Doc. # 16) filed July 10, 2003. For reasons stated below, the Court sustains in part defendant's motion to dismiss and overrules defendant's motion to quash and dismiss.

### Facts

Plaintiff alleges the following facts:

Emporia State University ("ESU") is an undergraduate and graduate institution of higher education which receives federal financial assistance. Since August 2, 1988, ESU has employed plaintiff as head coach for the women's volleyball team.

Because of her sex, ESU has denied plaintiff certain benefits of employment or discriminated against her by (1) paying her lower salary and benefits than similarly situated male employees; (2) awarding her smaller and less frequent increases in salary and benefits than similarly situated male employees; (3) denying plaintiff upgraded positions and promotions; (4) classifying plaintiff's job in a fashion which denies her the opportunity to be on the same 12–month contract as similarly situated male employees, to receive compensation commensurate with her experience and education, and to receive valuable employment rights and privileges; and (5) forcing plaintiff to work under terms, conditions and privileges which are less beneficial and desirable and more onerous and difficult than those of similarly situated male employees. *Complaint* (Doc. # 1) filed February 14, 2003 at 2–3.

ESU holds plaintiff to a different standard and places different requirements on her than it does on similarly situated male employees. For example, plaintiff must coach and teach, and successfully compete at the level as similarly situated male employees who coach but do not teach. ESU does not provide plaintiff the resources, financial support, coaching assistants, aids and equipment that it provides similarly situated male employees. Plaintiff has a smaller budget and fewer provisions than similarly situated male employees for team housing, dining and other facilities and services which are necessary to travel to and from sporting events. Plaintiff must promote her team with less assistance from ESU information services and athletic budget. Plaintiff receives less assistance with event promotion and management. Plaintiff must work in an atmosphere which is openly hostile to women. She must perform duties which ESU does not require of similarly situated male employees, and she must design and implement an effective recruitment program with less assistance and fewer resources.

Plaintiff alleges that ESU (1) discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* (Count I); (2) subjected her to a hostile work environment in violation of Title VII (Count II); (3) discriminated against her on the basis of sex in

violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) (Count III); and (4) discriminated against her on the basis of sex in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq.* and 34 C.F.R. §§ 106.1 *et seq.* (Count IV).

### Procedural History

Plaintiff filed suit on February 14, 2003. That same day, by certified mail, plaintiff sent the Notice of Lawsuit and Return of Waiver of Service of Process to Kay Schallenkamp, president of ESU. Exhibit 1 to *Plaintiff Mehus' Response In Opposition To Defendant Emporia State's Motion To Dismiss* ("*Plaintiff's Response*") (Doc. # 25) filed July 23, 2003. ESU did not return the waiver of service form. On March 18, 2003, plaintiff's counsel faxed a letter to ESU attorney Gayle Meierhoff, indicating that the deadline for execution of waiver of service was March 16, 2003, and asking whether ESU intended to execute the waiver. Exhibit 2 to *Plaintiff's Response* (Doc. # 25). Meierhoff referred plaintiff's counsel to Assistant Attorney General Scott Hesse.

Hesse instructed plaintiff's counsel to send the lawsuit information directly to him at the office of the Kansas Attorney General. On March 27, 2003, by certified mail, plaintiff's counsel sent Hesse the Notice of Lawsuit and Return of Waiver of Service of Process. Exhibit 3 to *Plaintiff's Response* (Doc. # 25). ESU did not return the waiver of service of process form, however, so on May 15, 2003—90 days after she filed suit—plaintiff formally served process on Governor Kathleen Sebelius. Exhibit 4 to *Plaintiff's Response* (Doc. # 25). On June 26, 2003, plaintiff filed a motion for costs of service of process. *See* (Doc. # 11).

In the meantime, on June 25, 2003, ESU had filed a motion to dismiss the complaint which plaintiff had served on Governor Sebelius, arguing that (1) plaintiff had not properly served ESU; (2) ESU is entitled sovereign immunity; and (3) plaintiff does not state a claim under Title IX. Plaintiff responded that she had properly served ESU under Fed.R.Civ.P. 4(j)(2); that Title VII, Title IX and the EPA abrogate States' sovereign immunity; and that she has a private cause of action under Title IX.

On July 2, 2003, the Court denied plaintiff's motion for costs of service of process, *see* Doc. # 14. Six days later, on July 8, 2003—145 days after she filed suit—plaintiff formally re-served the complaint on Assistant Attorney General Richard D. Smith. Exhibit 6 to *Plaintiff's Response* (Doc. # 25). On July 10, 2003, ESU filed a motion to quash that service and dismiss plaintiff's complaint because she did not effectuate service within 120 days under Rule 4(m), Fed.R.Civ.P. ESU also asked the Court to dismiss plaintiff's claim under Title VII because the statute of limitations barred refiling of her Title VII claims.

### Analysis

**I. Motion To Dismiss (Doc. # 6)**

**A. Service Of Process**

■ ESU asks the Court to dismiss plaintiff's claims, arguing that plaintiff did not timely serve the Attorney General or one of his assistants, as required by Kansas law, and that plaintiff's service on Governor Sebelius was insufficient because she is not the chief executive officer of ESU. *Memorandum In Support Of Motion To Dismiss* ("*Memorandum In Support*") (Doc. # 7) filed July 10, 2003, at 1–2. Specifically, ESU argues that it is an agency of the State of Kansas and that under Rule 4(j)(2), Fed.R.Civ.P., and K.S.A. § 60–304(d)(5), plaintiff was required to serve the Attorney General or one of his assistants. *Id.* at 1–2. Plaintiff agrees that she did not follow K.S.A. § 60–304(d)(5),

but responds that under Rule 4(j)(2), she is allowed to serve the chief executive officer of the State of Kansas, and that she properly did so by serving Governor Sebelius on May 15, 2003. *Plaintiff's Response* (Doc. # 25) at 3–4. ESU responds that for purposes of Rule 4(j)(2), the Attorney General is the chief executive officer of the State of Kansas and the Kansas Board of Regents is the chief executive for its member institutions, including ESU. *Memorandum In Support* (Doc. # 7) at 2.

Pursuant to Rule 4(j)(2), a plaintiff may obtain service on a State governmental agency "by delivering a copy of the summons and of the complaint to its chief executive officer" *or* by serving the summons and complaint in the manner prescribed by State law.

ESU is a State educational institution which is controlled by, operated and managed by the Board of Regents.[1] *See Kansas Bd. of Regents v. Pittsburg State Univ. Chapter of Kan.-Nat'l Educ. Assn.*, 233 Kan. 801, 811, 667 P.2d 306, 314 (1983); K.S.A. § 76–711. The Board of Regents may be sued and may defend any action brought against it or against any State educational institution, but State educational institutions also may be sued and defend actions against them. K.S.A. § 76–713. ESU is a State agency, K.S.A. § 76–712, and under K.S.A. § 60–304(d), a plaintiff may obtain service on a State agency by serving the State Attorney General or an Assistant Attorney General. In addition, K.S.A. § 76–714 provides that

[t]he chief executive officer[ ] of [ESU] shall have the title of president. The chief executive officer[ ] of [ESU] shall be appointed by the board of regents. Such chief executive officer[ ] shall serve at the pleasure of the board of regents and shall receive such compensation as the board of regents prescribes.

Based on the plain language of K.S.A. 76–714, the ESU president—President Schallenkamp—is the chief executive officer of ESU. Under Rule 4(j)(2), plaintiff could therefore obtain service of process by serving the Attorney General, an Assistant Attorney General, or President Schallenkamp as chief executive officer of ESU.

The Court therefore sustains ESU's motion, which it construes as a motion to quash, for insufficient service of the complaint which plaintiff served on Governor Sebelius on May 15, 2003. For reasons stated below, however, the Court finds that plaintiff later obtained service on ESU and it declines to dismiss plaintiff's complaint.

## B. Sovereign Immunity

ESU asks the Court to dismiss plaintiff's claims because it is entitled sovereign immunity. ESU specifically argues that plaintiff's claim under the EPA, 29 U.S.C. § 206(d), must be dismissed because (1) the EPA exceeds the constitutional authority of Congress to subject States to federal laws and (2) ESU has Eleventh Amendment immunity with regard to plaintiff's claims under the EPA.[2] ESU first con-

---

1. Article 6, section 2, of the Constitution of the State of Kansas directed the legislature to establish a State Board of Regents. K.S.A. § 76–712 authorizes the Board of Regents to make contracts and adopt orders, policies, or rules and regulations and to do or perform such other acts as are authorized by law or are appropriate for such purposes.

2. ESU also argues that if service of process on the chief executive of ESU is proper under Rule 4(j), that rule exceeds the authority of Congress to enforce the Fourteenth Amendment and violates the State's right to sovereign immunity. The Court need not address this issue because it finds that plaintiff properly accomplished service on Assistant Attorney General Smith on July 8, 2003 in compliance with Kansas law.

tends that in enacting the EPA, Congress exceeded its constitutional authority as defined in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). ESU also claims that the EPA is invalid under *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), because Congress did not explicitly declare that it was passing the EPA to enforce Fourteenth Amendment rights and—even if Congress was purportedly acting to enforce the Fourteenth Amendment—Congress chose means which do not fit an identified or hypothetical Fourteenth Amendment purpose. *Memorandum In Support* (Doc. # 7) at 11–12. ESU also relies on *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), for the proposition that State agencies are immune from private suit to enforce the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206, and the EPA, 29 U.S.C. § 206(d), which is part of the FLSA. Plaintiff argues that (1) the Tenth Circuit, along with other circuits, has held that Congress validly abrogated State sovereign immunity under the EPA; and (2) ESU improperly interprets *Alden*.

## 1. Sovereign Immunity Under The Eleventh Amendment

In 1963, Congress enacted the Equal Pay Act, 29 U.S.C. § 206(d), as an amendment to the FLSA. In doing so, it acted on its finding that sex-based wage differentials had a substantial adverse impact on interstate commerce. *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 837 (6th Cir.1997); 29 U.S.C. § 206(d)(1). The EPA therefore required that all persons who perform equal work receive equal pay unless the differential is justified by a consideration other than sex.[3] 29 U.S.C. § 206(d). As with many civil rights statutes, the EPA initially applied only to private employers. In 1974, however, Congress extended the Act to define States as employers and thus subject them to potential liability under the Act. *Timmer*, 104 F.3d at 837.

The private enforcement provision of the FLSA, of which the EPA is a part, pro-

---

**3.** Specifically, the EPA provides that:
(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.
(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter.
(4) As used in this subsection, the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.
29 U.S.C.A. § 206(d).

vides that "[a]n action to recover the liability prescribed ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).[4]

■■■ The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.[5] The Eleventh Amendment doctrine of sovereign immunity bars actions for damages against a State, its agencies and its officials acting in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ambus v. Granite Bd. of Educ.,* 995 F.2d 992, 994 (10th Cir.1993) (Eleventh Amendment immunity extends to agencies that act as arms of State). Universities established by the State of Kansas and governed by the Kansas Board of Regents function as alter egos of the State and share its Eleventh Amendment immunities. *Brennan v. Univ. of Kan.,* 451 F.2d 1287, 1290–91 (10th Cir.1971); *Billings v. Wichita State Univ.,* 557 F.Supp. 1348, 1350 (D.Kan. 1983); *Holt v. Wichita State Univ.,* No. 82–1172 (D.Kan. Sept.7, 1982). The bar, however, is not absolute; States may consent to be sued in federal court and Con-

gress may abrogate their sovereign immunity. *See Port Auth.,* 495 U.S. at 304, 110 S.Ct. 1868.

As noted, ESU contends that in enacting the EPA, Congress did not validly abrogate its sovereign immunity. To resolve this issue, the Court must determine whether Congress unequivocally expressed its intent to abrogate that immunity and, if it did, whether Congress acted pursuant to a valid grant of constitutional authority. *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

### a. Intent To Abrogate

■■■ Evidence of congressional intent to abrogate exists where Congress has explicitly provided a private action against State governments, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), or where a statute's legislative history makes it plain that "Congress considered and firmly rejected the suggestion that States should be immune," *Hutto v. Finney,* 437 U.S. 678, 698 n. 31, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). To conclude that Congress has overturned the constitutionally guaranteed immunity of the States, clear and positive indicia of intent to subject a State to suit in federal court must exist. *Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

■■■ ESU does not argue that Congress lacked the intent to subject States to suit in federal court to enforce rights under the EPA. Given the plain language of the statute, the EPA contains a "clear statement"

---

4. The FLSA defines "employer" to include "a public agency," 29 U.S.C. § 203(d), which is defined as "the government of a State or political subdivision thereof" and any agency of a State. 29 U.S.C. § 203(x). An "employee" is defined as "any individual employed by a State, political subdivision of a State, or an interstate governmental agency." 29 U.S.C. § 203(e)(2)(C).

5. Under the Eleventh Amendment, an unconsenting State is immune from federal-court suits brought by its own citizens as well as by citizens of another State. *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990).

of congressional intent to abrogate the States' Eleventh Amendment immunity. *See Ussery v. State of Louisiana,* 150 F.3d 431, 435 (5th Cir.1998); *Timmer,* 104 F.3d at 837–38; *see also Mills v. Maine,* 118 F.3d 37, 42 (1st Cir.1997) (Eleventh Amendment challenge to overtime and minimum wage provisions of FLSA); *Brinkman v. Dep't of Corr.,* 21 F.3d 370, 372 (10th Cir.1994) (same); *Reich v. New York,* 3 F.3d 581, 590–91 (2d Cir.1993) (same); *Hale v. Arizona,* 993 F.2d 1387, 1391–92 (9th Cir.1993) (en banc) (same). Accordingly, the Court finds that Congress intended to abrogate the States' Eleventh Amendment immunity from suits alleging violations of the EPA. *See Varner v. Ill. State Univ.,* 226 F.3d 927, 930 (7th Cir. 2000); *Kovacevich v. Kent State Univ.,* 224 F.3d 806, 816 (6th Cir.2000); *O'Sullivan v. Minnesota,* 191 F.3d 965, 967 (8th Cir. 1999); *Timmer,* 104 F.3d at 842; *see also Hale v. Mann,* 219 F.3d 61, 67 (2d Cir. 2000); *Kusjanovic v. Oregon,* 243 F.Supp.2d 1137, 1138 (D.Or.2002); *Anderson v. State Univ. of N.Y.,* 107 F.Supp.2d 158, 160 (N.D.N.Y.2000); 29 U.S.C. § 216(b).

#### b. Whether Congress Acted Pursuant To A Valid Grant Of Constitutional Authority To Abrogate

Congress may validly abrogate States' Eleventh Amendment immunity under Section 5 of the Fourteenth Amendment and plaintiff may maintain her EPA claim against ESU only if the EPA is appropriate legislation under Section 5. *See Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 690, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank,* 527 U.S. 627, 636–37, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Alden,* 527 U.S. at 756, 119 S.Ct. 2240; *Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. 1114; *Fitzpatrick,* 427 U.S. 445, 96

S.Ct. 2666. As noted above, ESU argues that the Congress did not validly abrogate State sovereign immunity under the EPA because (1) Congress did not explicitly declare that it was passing the EPA to enforce Fourteenth Amendment rights, and (2) even if Congress purportedly acted pursuant to the Fourteenth Amendment, it chose means which did not fit an identified or hypothetical Fourteenth Amendment purpose.

■ Congress enacted the EPA pursuant to its Commerce Clause powers and it initially limited EPA liability to private employers. *See Hundertmark v. State of Florida Dep't of Transp.,* 205 F.3d 1272, 1274–75 (11th Cir.2000); *Ussery,* 150 F.3d at 435. In 1974, when Congress extended EPA liability to the States, it did not make a definitive statement regarding the constitutional authority under which it purported to act. It is well settled, however, that "the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948). *Seminole Tribe* requires that the Court make an objective inquiry, *i.e.* whether Congress could have enacted the legislation pursuant to a constitutional provision granting it the power to abrogate. As long as Congress had such authority as an objective matter, it is irrelevant whether Congress also had the specific intent to legislate pursuant to that authority. *Crawford v. Davis,* 109 F.3d 1281 (8th Cir.1997).

■ In *Katzenbach v. Morgan,* the Supreme Court held that Section 5 of the Fourteenth Amendment "is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment."[6] 384 U.S. at 651, 86 S.Ct. 1717. It also held that Sec-

---

**6.** The Fourteenth Amendment provides, in relevant part:

tion 5 authorizes Congress to enact legislation that (1) may be regarded as an enactment to enforce the equal protection clause; (2) is plainly adapted to that end; and (3) is not prohibited by but is consistent with the letter and spirit of the Constitution. *Id.* Thirty years after *Katzenbach*, in *Seminole Tribe*, 517 U.S. 44, 116 S.Ct. 1114, the Supreme Court held that Congress can abrogate Eleventh Amendment immunity only under the authority granted by Section 5 of the Fourteenth Amendment.[7] *Seminole Tribe* erected a two-pronged test to determine the validity of Section 5 abrogation. First, as noted above, the Court must determine whether Congress "unequivocally expresse[d] its intent to abrogate the immunity." *Id.* at 55, 116 S.Ct. 1114. As to the EPA, this Court has answered that question in the affirmative. Second, the Court must determine whether Congress acted pursuant to a valid exercise of its power under Section 5 of the Fourteenth Amendment. *Id.*

In *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court explained that Congress' power under Section 5 is limited to enacting remedial or preventative measures, and does not permit Congress to substantively expand Fourteenth Amendment rights. *Id.* at 519, 117 S.Ct. 2157 (Congress has power to "enforce," not power to determine what constitutes constitutional violation). In acting to remedy and prevent constitutional violations Congress may "prohibit[ ] conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States." *Id.* at 518, 117 S.Ct. 2157 (quotations and citations omitted). The Supreme Court acknowledged, however, that the distinction between remedial and substantive legislation is a difficult one and that Congress must be granted "wide latitude in determining where it lies." *Id.* at 519–20, 117 S.Ct. 2157. To assess on what side of that line a given law falls, the Supreme Court crafted the so-called "congruence and proportionality" test, explaining that for legislation to be valid, "there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520, 117 S.Ct. 2157.

In *Kimel*, 528 U.S. 62, 120 S.Ct. 631,[8] and *Florida Prepaid*, 527 U.S. 627, 119

---

Section 1 . . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. * * *
Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.
U.S. Const. amend. XIV.

7. Before *Seminole Tribe*, the Supreme Court had recognized two sources of authority through which Congress could validly abrogate the State's sovereign immunity: the interstate commerce clause, *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), and Section 5 of the Fourteenth Amendment, *Fitzpatrick*, 427 U.S. at 456, 96 S.Ct. 2666. In *Seminole Tribe*, the

Supreme Court overruled *Union Gas*, determining that the interstate commerce clause does not provide Congress the authority to abrogate the States' Eleventh Amendment immunity. *Id.* at 65–66, 109 S.Ct. 2273.

8. *Kimel* addressed the question whether the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, constituted a valid abrogation of Eleventh Amendment immunity. The ADEA, like the EPA, originally applied only to private employers. *See* 29 U.S.C. § 630(b) (1964 ed., Supp. III). In 1974, in the same FLSA amendments which amended the EPA, Congress extended the substantive requirements of the ADEA to the States. *See* Fair Labor Standards Amendments of 1974, § 28, 88 Stat. 74. Specifically, Congress amended the definition of "employer" to include "a State or political subdivision of a State and any agency or in-

S.Ct. 2199,[9] the Supreme Court clarified the scope of Congress' enforcement powers. When invoking Section 5 of the Fourteenth Amendment, Congress must identify conduct which transgresses the Amendment's substantive provisions and must tailor the legislative scheme to reme-

dy or prevent such conduct. *Florida Prepaid*, 527 U.S. at 641, 119 S.Ct. 2199.

As noted above, the sole constitutional basis on which Congress could have abrogated the State's Eleventh Amendment immunity is Section 5 of the Fourteenth

strumentality of a State or a political subdivision of a State," 29 U.S.C. § 630(b). Congress also amended the FLSA enforcement provision, which the ADEA incorporates by reference, to permit an individual to bring a civil action "against any employer (including a public agency) in any Federal or State court of competent jurisdiction," 29 U.S.C. § 216(b). The Supreme Court held that in doing so, Congress made unmistakably clear its intent to abrogate. 528 U.S. at 75–76, 120 S.Ct. 631.

Applying the congruence and proportionality test from *Seminole Tribe*, the Supreme Court determined that in extending ADEA liability to the States, Congress had not constitutionally exercised its powers under Section 5 of the Fourteenth Amendment. *Id.* at 82–91, 116 S.Ct. 1114. Specifically, the Supreme Court reiterated that legislation must evidence a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 81, 116 S.Ct. 1114 (quotations and citations omitted). In other words, Congress must carefully tailor its legislation so that it enforces the Fourteenth Amendment without altering the meaning of that Amendment. The Supreme Court found that the substantive requirements which the ADEA imposed on the States were disproportionate to any unconstitutional conduct which the Act may have targeted. *Id.* at 83, 116 S.Ct. 1114. The Supreme Court distinguished classifications based on age from classifications based on race or gender, which are constitutional only if they are narrowly tailored to further compelling governmental interests and the discriminatory means used are substantially related to those interests, *id.* at 84, 116 S.Ct. 1114, and noted the lack of a "history of purposeful unequal treatment" of older people which could justify congressional action under Section 5 of the Fourteenth Amendment. *Id.* at 83, 116 S.Ct. 1114.

In light of the indiscriminate scope of the ADEA and legislative history which revealed that Congress had not identified any pattern of age discrimination by the States (much less

discrimination which rose to the level of a constitutional violation), the Supreme Court held that the ADEA was not a valid exercise of Congress' power under Section 5 of the Fourteenth Amendment. *Id.* at 89–91, 116 S.Ct. 1114. The purported abrogation of the States' sovereign immunity in the ADEA was therefore invalid. *Id.* at 91, 116 S.Ct. 1114.

9. *Florida Prepaid* held that Congress did not have authority under the Fourteenth Amendment to abrogate the States' sovereign immunity from suits under the Patent and Plant Variety Protection Remedy Clarification Act ("Patent Remedy Act"), 35 U.S.C. § 271. 527 U.S. at 641, 119 S.Ct. 2199. The Supreme Court found that the Act failed the "congruence and proportionality" test, in part because Congress had not identified systematic patent infringement by States when it enacted the statute. *Id.* at 640–41, 119 S.Ct. 2199. When it enacted the Patent Remedy Act, Congress did not make findings which indicated that the Act was aimed at such unconstitutional infringement. According to the Supreme Court, the legislative record therefore suggested that the Act did not respond to a history of "widespread and persisting deprivation of constitutional rights of the sort that Congress had faced in enacting proper prophylactic legislation under Section 5 of the Fourteenth Amendment." *Id.* at 628, 119 S.Ct. 2199 (quoting *City of Boerne*, 521 U.S. at 526, 117 S.Ct. 2157). Indeed, the Supreme Court noted that patent infringement by a State is not necessarily unconstitutional, *id.* at 641, 119 S.Ct. 2199, a State violates the Constitution only if it "provides no remedy, or only inadequate remedies, to injured patent owners for its infringement of their patent," *id.* (citations omitted), and found little likelihood that the acts of infringement covered by the Patent Remedy Act were unconstitutional. Rather, the statute's goal was to "provide a uniform remedy for patent infringement and to place States on the same footing as private parties under the regime." *Id.* at 647–48, 119 S.Ct. 2199.

Amendment. *See Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114. The Court therefore decides whether Congress had authority under Section 5 of the Fourteenth Amendment to abrogate the States' Eleventh Amendment immunity under the EPA.

The Tenth Circuit has not specifically decided whether Congress had such authority. It has however, addressed sovereign immunity under the wage and overtime provisions of the FLSA. *Aaron v. State of Kan.*, 115 F.3d 813 (10th Cir.1997). In *Aaron*, Kansas Bureau of Investigation Agents, highway patrol troopers and conservation officers brought wage and overtime claims under the FLSA. 115 F.3d at 814. The Tenth Circuit held that in its attempt to abrogate State sovereignty with regard to these FLSA claims, Congress had acted pursuant to the interstate commerce clause rather than Section 5 of the Fourteenth Amendment and that as a result, it had not properly abrogated the Eleventh Amendment immunity of the State of Kansas. *Id.* at 815–16.

Various other circuits have addressed the question whether the EPA has properly abrogated the States' sovereign immunity pursuant to Section 5 of the Fourteenth Amendment. Each such circuit has held that it did. *See Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541, 553 (7th Cir.2001); *Siler–Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542 (5th Cir.2001); *Varner*, 226 F.3d at 936; *Kovacevich*, 224 F.3d 806; *Timmer*, 104 F.3d at 837.

In *Varner*, the Seventh Circuit held that Congress had validly abrogated the States' sovereign immunity as to EPA claims. 226 F.3d 927. In that case, a class of tenure-track female faculty members brought EPA claims in the Central District of Illinois. The district court over-

ruled defendant's motion to dismiss that claim on Eleventh Amendment grounds. 226 F.3d at 929. The Seventh Circuit affirmed, finding that Congress had clearly intended to abrogate the States' Eleventh Amendment immunity and that the abrogation was a valid exercise of its authority under Section 5 of the Fourteenth Amendment. *Id.* The Supreme Court vacated and remanded to the Seventh Circuit for further consideration in light of *Kimel*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522.

On remand, the Seventh Circuit noted that to validly abrogate the States' immunity, Congress must (1) unequivocally express its intent to abrogate and (2) act pursuant to a valid exercise of power. *Id.* at 930 (citing *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114). Defendant conceded that Congress had unequivocally expressed its intent to abrogate, so the Seventh Circuit analyzed whether Congress acted pursuant to a valid exercise of congressional power under Section 5 of the Fourteenth Amendment. *Id.* In doing so, it used the congruence and proportionality test from *Seminole Tribe* and compared the ADEA, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 *et seq.*, and the EPA. *Id.* at 931. It noted that in *Kimel*, the Supreme Court had held that abrogation was not a valid exercise of Section 5 power because the ADEA was "indiscriminate" in scope and the legislative record lacked evidence of "widespread and unconstitutional age discrimination by the States." *Id.* (quoting *Kimel*, 528 U.S. at 92, 120 S.Ct. 631). The Seventh Circuit also held that Congress had exceeded its authority in enacting the ADA because the "disparate-impact and mandatory accommodation rule found in the ADA far exceeded the constitution protections provided by the Equal Protection Clause." *Id.* at 932 (quotations omitted, citing *Erickson v. Bd. of Governors of State Colls. & Univs. for N.E. Ill. Univ.*, 207 F.3d 945, 951 (7th Cir.2000)).[10]

---

**10.** In *Bd. of Trustees of the Univ. of Ala. v.* *Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148

The Seventh Circuit, however, held that the EPA's remedial regime is less indiscriminate than that of the ADEA because unlike the ADEA, the EPA targets a kind of discrimination which the Constitution forbids—sex discrimination. *Id.* at 933–34. The Seventh Circuit noted that by providing a broad exemption from liability to an employer who can provide a neutral explanation for pay disparities, the EPA targets employers who intentionally discriminate against women. *Id.* at 934. It therefore concluded that Congress had validly exercised its authority under Section 5 of the Fourteenth Amendment when it extended the EPA to cover wage discrimination on the part of State employers. *Id.* at 936.

In *Cherry*, where a former female professor alleged that defendant violated the EPA by paying her a lower rate of compensation than male colleagues because of sex, the Seventh Circuit revisited its decision in *Varner*. 265 F.3d at 552. Defendant moved to dismiss on Eleventh Amendment grounds, citing *Garrett*, 531 U.S. 356, 121 S.Ct. 955, in which the Supreme Court held that Congress had failed to validly abrogate the States' immunity from claims under the ADA. 265 F.3d at 545–46. The district court denied defendant's motion. On appeal, the Seventh Circuit found that the EPA prohibits very little constitutional conduct and targets only unconstitutional gender discrimination, and that Congress had validly exercised its authority under Section 5 of the Fourteenth Amendment when it extended the EPA to the States. *Id.* at 553.

In *Siler–Khodr*, 261 F.3d 542, a female professor alleged that her employer violated the EPA by paying her unequal compensation on the basis of sex. A jury awarded back pay and compensatory damages. Defendant appealed, arguing under *Kimel* that Congress had exceeded its authority when it abrogated the States' Eleventh Amendment immunity in the EPA. The Fifth Circuit rejected this argument, holding that Congress had properly abrogated the States' sovereign immunity even though it did not explicitly state that it was acting under Section 5 of the Fourteenth Amendment and the legislative record did not specifically find that the States had been engaging in a pattern of unconstitutional conduct which the EPA was intended to prevent. 261 F.3d at 550. Specifically, the Fifth Circuit stated that "the EPA ... does not violate the Eleventh Amendment ... because it is congruent and proportional 'between the injury to be prevented or remedied and the means adopted to that end' and is therefore an appropriate use of Congress's § 5 power." *Id.* (quoting *City of Boerne*, 521 U.S. at 520, 117 S.Ct. 2157). It also noted that in *Kimel*, the Supreme Court had distinguished between State discrimination on the basis of age, which requires a rational basis review, and State discrimination on the basis of race or gender, which requires a higher standard of review. The Fifth Circuit also noted that under *Kimel*, lack of legislative findings was not determinative of the Section 5 inquiry, *id.* at 550–51 (quoting *Kimel*, 528 U.S. at 91, 120 S.Ct. 631), because the "historical record clearly demonstrates that gender discrimination is a problem that is national in scope," whether or not committed in the public sector. *Id.* at 551 (quoting *Varner*, 226

L.Ed.2d 866 (2001), the Supreme Court determined that disability, like age, is subject to a rational basis review, *i.e.* State policies which involve disability classifications must be rationally related to a legitimate government purpose. 531 U.S. at 366, 121 S.Ct. 955. In

*Varner*, the Seventh Circuit noted that both age and disability classifications receive a rational basis review under the Constitution, while gender-based classifications are afforded heightened scrutiny. 226 F.3d at 934.

F.3d at 935–36, and citing *Kovacevich*, 224 F.3d at 821 n. 6).

In *Timmer*, 104 F.3d 833, plaintiff sued a State agency under the EPA. The District Court for the Western District of Michigan granted summary judgment to defendant, finding that plaintiff had established a prima facie case of wage discrimination but that as a matter of law, the differential was based on a factor other than sex. Plaintiff appealed, and the Sixth Circuit asked the parties to file supplemental briefs addressing the issue of subject matter jurisdiction in light of *Seminole Tribe*, 517 U.S. 44, 116 S.Ct. 1114. In addressing that issue, the Sixth Circuit held that when Congress enacted the EPA, it had validly abrogated the States' immunity under Section 5. 104 F.3d at 837–42. It concluded that Congress exhibited both the intent and the requisite power to abrogate. *Id.* at 838–39. Specifically, although the EPA does not articulate the basis of Congress' power, the Sixth Circuit held that no such requirement exists and intent to act pursuant to Section 5 of the Fourteenth Amendment can be inferred. *Id.* at 841–42.

Three years after this decision, in *Kovacevich*, 224 F.3d 806, the Sixth Circuit reviewed *Timmer* in light of *Kimel*. In *Kovacevich*, the District Court for the Northern District of Ohio granted defendant's motion for judgment as a matter of law on plaintiff's EPA claim. On appeal, the Sixth Circuit again held that the EPA constituted a proper abrogation of Eleventh Amendment immunity. 224 F.3d at 816. Regarding *Kimel*, the Sixth Circuit held that the EPA is congruent and proportional to Congress' Section 5 enforcement power because (1) "the EPA's substantive requirements are not disproportionate to the unconstitutional conduct targeted by the Act," and (2) "the EPA's remedial scheme is proportional to its anti-discriminatory aims."

*Id.* at 819–20. Specifically, it noted that a State which "intentionally discriminates on the basis of gender violates the Fourteenth Amendment unless the gender-based classification serves important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 820 (quotations and citations omitted). Because the EPA targets intentional discrimination to remedy an "endemic problem," and its remedial scheme is proportional to its anti-discriminatory aims, the Sixth Circuit held that Congress' abrogation of State immunity pursuant to the EPA is proper. *Id.*

The reasoning of these cases is persuasive. The Court specifically adopts the analyses with respect to the congruence and proportionality test and concludes that Congress validly exercised its authority under Section 5 of the Fourteenth Amendment when it extended the EPA to claims against the States. The Court therefore finds that Congress' abrogation of State immunity pursuant to the EPA is proper and that ESU's alleged violation of the EPA is not shielded by the Eleventh Amendment. The Court overrules ESU's motion to dismiss plaintiff's EPA claim on Eleventh Amendment grounds.

2. *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)

As stated above, ESU argues that under *Alden*, the State and its agencies are immune from private suit to enforce the EPA, which is part of the FLSA. In *Alden*, State probation officers brought suit in federal court against their employer, the State of Maine, alleging a violation of FLSA overtime provisions. While the suit was pending, the United States Supreme Court decided *Seminole Tribe*, 517 U.S. 44, 116 S.Ct. 1114, holding that Congress lacked power under Article I of the Consti-

tution to abrogate the States' sovereign immunity from suits commenced or prosecuted in federal courts. Upon consideration of *Seminole Tribe*, the trial court dismissed plaintiffs' actions on the basis of sovereign immunity. *See Mills*, 118 F.3d 37. The First Circuit affirmed. *Id.* Plaintiffs then re-filed their action in State court, which also dismissed on the basis of sovereign immunity. The Maine Supreme Judicial Court affirmed. On appeal, the United States Supreme Court held that the powers delegated to Congress under Article I do not include the power to subject non-consenting States to private suits for damages in *State* courts. 527 U.S. at 754, 119 S.Ct. 2240.

The EPA, unlike the FLSA overtime provisions at issue in *Alden*, is an exercise of congressional power under Section 5 of the Fourteenth Amendment. Moreover, this case presents a question of sovereign immunity in federal rather than State court. *Alden* has no apparent bearing on this case. The Court overrules ESU's motion to dismiss on this issue.

### C. Failure To State A Claim Under Title IX

Title IX prohibits educational institutions which receive federal assistance from discriminating on the basis of sex. 20 U.S.C. § 1681(a) (1990). Specifically, Title IX provides that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). ESU asks the Court to dismiss plaintiff's Title IX claim, arguing that plaintiff does not allege intentional discrimination and that she has no private remedy under Title IX or its implementing regulations. Plaintiff correctly responds that Title IX does not require proof of intentional discrimination, and argues that

she has a private right of action for employment discrimination under Title IX.

■ In ruling on a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well pleaded facts and views them in a light most favorable to plaintiff. *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The Court makes all reasonable inferences in favor of plaintiff, and liberally construes the pleadings. Rule 8(a), Fed.R.Civ.P.; *Lafoy v. HMO Colo.*, 988 F.2d 97, 98 (10th Cir. 1993). The Court may not dismiss a cause of action for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of her theories of recovery that would entitle her to relief. *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kan.*, 927 F.2d 1111, 1115 (10th Cir.1991). Although plaintiff need not precisely state each element of her claims, she must plead minimal factual allegations on material elements that must be proved. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991).

#### 1. Intentional Discrimination

■ To state a cause of action under Title IX, plaintiff must allege that (1) she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program; (2) the program receives federal assistance; and (3) the exclusion was on the basis of sex. *Bougher v. Univ. of Pittsburgh*, 713 F.Supp. 139, 143–44 (W.D.Pa. 1989), *aff'd*, 882 F.2d 74 (3d Cir.1989). Plaintiff is not required to allege discriminatory intent. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* is "the most appropriate analogue when defining Title IX's substantive standards, including the question of whether 'disparate impact' is sufficient to establish discrimination under Title IX." *Mabry v. State Bd. of Cmty. Colls. & Occupational Educ.*, 813 F.2d 311, 316 n. 6 (10th Cir.),

*cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). Because it is well settled that Title VII does not require proof of overt discrimination, direct proof of discriminatory intent is not required. *Roberts v. Colo. State Bd. of Agric.,* 998 F.2d 824, 833 (10th Cir.1993) (citing *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) and *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)). The Court therefore overrules ESU's motion on this basis.

### 2. Private Remedy Under Title IX

Plaintiff alleges that ESU discriminated against her on the basis of sex in violation of Title IX, 20 U.S.C. §§ 1681 *et seq.* and 34 C.F.R. §§ 106.1 *et seq.* when it denied her certain benefits of employment or discriminated against her by (1) paying her lower salary and benefits than similarly situated male employees; (2) awarding her smaller and less frequent increases in salary and benefits than similarly situated male employees; (3) denying her upgraded positions and promotions; (4) classifying her job in a fashion which denies her the opportunity to be on the same 12–month contract as similarly situated male employees, to receive compensation commensurate with her experience and education, and to receive valuable employment rights and privileges; and (5) forcing her to work under terms, conditions and privileges which are less beneficial and desirable and more onerous and difficult than those of similarly situated male employees.

 ESU argues that Title IX and its implementing regulations do not authorize a private cause of action for damages.[11] Plaintiff responds that under *Franklin,* 503 U.S. at 76, 112 S.Ct. 1028, federal courts have authority to enforce Title IX damage remedies against State agencies.

 Title IX prohibits gender discrimination in education programs or activities that receive federal financial assistance. 20 U.S.C. § 1681. Employment discrimination comes within this prohibition. *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 531, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). Congress expressly enacted only one enforcement mechanism with regard to Title IX: it empowered any agency involved in extending federal financial assistance to issue rules, regulations or orders of general applicability, 20 U.S.C. § 1682, and to terminate federal assistance for noncompliance with such rules. *Id.* It is well established, however, that Title IX is enforceable through an implied right of action. *Cannon v. Univ. of Chicago,* 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *see also Franklin,* 503 U.S. at 75–76, 112 S.Ct. 1028; *Roberts,* 998 F.2d at 825 n. 2, 833–34. Money damages are also available under Title IX. *See Franklin,* 503 U.S. at 76, 112 S.Ct. 1028.

Plaintiff's complaint states a Title IX claim. The Court therefore overrules ESU's motion to dismiss plaintiff's claims under Title IX.

### II. Motion To Quash Summons, Service Of Summons And Motion To Dismiss (Doc. # 16)

#### A. Service Of Process

Rule 4(m) requires that plaintiff serve the summons and complaint within 120

---

**11.** ESU also asks the Court to dismiss plaintiff's claim under Title IX because she has not alleged that she exhausted administrative remedies by presenting her cause of action to the Assistant Secretary for Civil Rights, as allegedly required by 28 U.S.C. §§ 1682 and 1683. Title IX, however, does not require that plaintiff exhaust administrative remedies before bringing suit in federal court. *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 707 n. 41, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Title IX administrative remedies inadequate for private complainant).

days after filing of the complaint and directs the Court to dismiss the action without prejudice if this deadline is not met or—if plaintiff shows good cause for the failure—order that service be effected within a specified time. Plaintiff filed her complaint on February 14, 2003. She made effective service on Assistant Attorney General Smith on July 8, 2003—145 days later. Plaintiff therefore did not timely serve ESU. Further, she did not seek an extension of time. Had she done so, the preliminary inquiry under Rule 4(m) would have been whether plaintiff had shown good cause for the failure to timely effect service. *Espinoza v. United States*, 52 F.3d 838, 841 (10th Cir.1995). If good cause was shown, plaintiff would have been entitled to a mandatory extension of time. If plaintiff did not show good cause, the Court would have been required to consider whether a permissive extension of time was warranted, and in its discretion the Court could have either dismissed the case without prejudice or extended the time for service. *Id.*

■■■ ESU asks the Court to quash the summons and service of the summons, arguing that service on Assistant Attorney General Smith was untimely. ESU also asks the Court to dismiss plaintiff's Title VII claim, arguing that is time barred. Plaintiff argues that her Title VII claim is not time barred because she filed suit within 90 days of receiving her Notice of Right to Sue letter. She also asks the Court to acknowledge as valid the service which she accomplished after 120 days had expired. Under D. Kan. Rule 6.1, the Court construes her argument as a motion for leave to make service after the expiration of the prescribed deadline and asks whether her failure to timely serve ESU was due to excusable neglect.

Plaintiff's decision to serve Governor Sebelius, rather than President Schallenkamp, the Attorney General or his assistant, apparently resulted from a misunderstanding of the relevant case law. Plaintiff did not stand idly by, however, or deliberately attempt to stall proceedings by delaying service of process. Plaintiff's counsel attempted service on four occasions, on ESU President Schallenkamp (who declined to execute the waiver of service), on Assistant Attorney General Hesse (who also declined to execute the waiver), on Governor Sebelius (who filed an appropriate motion to quash), and on Assistant Attorney General Smith (who does not contest service, except as to timeliness). By asking plaintiff's counsel to send him the suit papers, Hesse implicitly invited plaintiff's counsel to believe that ESU intended to waive formal service of process. Furthermore, after defendant filed its motion to dismiss for lack of proper service, plaintiff's counsel promptly made otherwise proper, if untimely, service on Smith.

In evaluating whether untimely service should be recognized in this case, the Court is necessarily mindful of the fact that on proper motion, it could have granted a permissive extension of time even if plaintiff had not shown good cause for her failure to make timely service. *See Hunsinger v. Gateway Mgmt. Assocs.*, 169 F.R.D. 152, 155 (D.Kan.1996). Several factors would have guided this inquiry, including whether defendant would have been prejudiced by an extension, whether it was on notice of the lawsuit, and whether the applicable statute of limitations would bar the refiled action. *Espinoza*, 52 F.3d at 842 (quoting Fed.R.Civ.P. 4(m) advisory committee note (1993)); *Booker v. Merck Human Health, Inc.*, 2000 WL 382000, at *3 (D.Kan. Jan.19, 2000). At this point, as defendant has indeed argued, dismissal of the complaint might well bar plaintiff's claims. This fact counsels against dismissal. Moreover, defendant has been on notice of plaintiff's lawsuit since its commencement, and it has not

suffered prejudice by plaintiff's delay in service. Under these circumstances, the Court finds that plaintiff's service on Smith—25 days after the 120–day deadline—should be recognized as sufficient. The Court therefore overrules defendant's motion to quash.

### B. Statute Of Limitations

Pursuant to 42 U.S.C. § 2000e–5(f)(1), plaintiff must bring her Title VII claim within 90 days of receipt of notice of right to sue. *Jarrett v. U.S. Sprint Comm. Co.,* 22 F.3d 256 (10th Cir.1994). For purposes of this motion, ESU concedes that plaintiff brought suit within 90 days of receipt of notice of right to sue, but asserts that 42 U.S.C. § 2000e–5(f)(1) bars her Title VII claim because she did not serve ESU within the 120 days required by Rule 4. ESU argues that plaintiff's failure to serve it within the 120 days leaves her in the same position as if she had never commenced the action.

ESU's argument assumes that plaintiff did not properly effectuate service on ESU. As stated above, however, the Court finds that plaintiff effectively served Assistant Attorney General Smith. Because plaintiff brought her Title VII claim within 90 days of receipt of notice of right to sue, the Court overrules ESU's motion to dismiss plaintiff's claim under Title VII.

**IT IS THEREFORE ORDERED** that defendant's *Motion To Dismiss* (Doc. # 6) filed June 25, 2003 be and hereby is **SUSTAINED in part.** The Court sustains ESU's motion to dismiss for insufficient service the complaint which plaintiff served on Governor Sebelius on May 15, 2003. The Court **OVERRULES** ESU's motion to dismiss (1) plaintiff's EPA claim on Eleventh Amendment grounds and (2) her claims under Title IX.

**IT IS FURTHER ORDERED** that defendant's *Motion To Quash Summons, Service Of Summons And Motion To Dis-*

*miss* (Doc. # 16) filed July 10, 2003 be and hereby is **OVERRULED.**